### IN THE UNITED STATES BANKRUTPCY COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                 )

                      )      Case No.: 14-21180

RIVERHOUNDS EVENT CENTER, L.P.,    )

                      )

        Debtor.            )

                      )      Chapter 11

DAVID M. WILKE;             )

GREENTREE SPORTSPLEX, LP;      )

WILKE & ASSOCIATES, LLP;       )

DW & BW, INC.               )

                      )      Hearing Date:

        Movants.          )

                      )

_____ )

### MOTION TO APPOINT A CHAPTER 11 TRUSTEE
### PURSUANT TO 11 U.S.C. § 1104(a)-(b)

AND NOW, come David M. Wilke, Greentree Sportsplex, LP, Wilke & Associates, LLP, and DW & BW, Inc. ("Movants"), by and through their undersigned counsel, Sherrard, German & Kelly, P.C., and moves this Court to appoint a Chapter 11 Trustee in this bankruptcy case pursuant to 11 U.S.C. § 1104(a) and (b), on the grounds that the Debtor Riverhounds Event Center, L.P., and its purported principal and majority owner, Terrance C. Shallenberger and/or Shallenberger Investments, LLC (collectively referred to as "Shallenberger"), have committed dishonest acts and gross mismanagement of the affairs of the Debtor, have numerous and significant conflicts of interest, and such appointment is in the best interests of creditors.

This Motion is based upon the following memorandum of points and authorities, the attached exhibits, and oral argument that the Court may allow at a hearing on this Motion.

### BRIEF INTRODUCTION

1.      The factual predicate from which this bankruptcy stems began in the summer of 2013, when Debtors had incurred various debts, most of which stemmed from cost overruns

during the construction of Riverhounds' Highmark Stadium in 2012.   During that time,
Shallenberger agreed to step forward to repay approximately $4.6 million of those debts in
exchange for a 51% ownership interest in both the team and the stadium.   Yet, instead of
repaying the debts of the team and stadium, Shallenberger engaged in a pattern of self-dealing
wherein he seized a 51% ownership interest in both the team and stadium in exchange for a
single payment of $1,080.  It is believed that notwithstanding the breach of his obligations to the
team and stadium, Shallenberger has continued such self-dealing by authorizing and initiating
these bankruptcies with the intent to acquire the other 49% ownership interest in the team and
stadium at a bargain basement price.  Movants do not file this Motion seeking adjudication on
the merits of the issues related to Shallenberger's self-dealing and overall game plan at this time.
This Motion, however, is intended to make clear that, due to Shallenberger's self-dealing and
unequivocal inability to pursue a significant cause of action of the estate against himself, a
Chapter 11 trustee must be appointed to protect Debtor, creditors, and all other interested
stakeholders in this action.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and
1334.

3.      Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. §§
1408 and 1409.

4.      The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. §
157. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a) and 1104(a)
of the Bankruptcy Code.

## FACTUAL AND PROCEDURAL HISTORY

5.      The Debtor, Riverhounds Event Center, LP ("REC"), filed a voluntary petition under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, on March 26, 2014.

6.      REC is a limited partnership organized pursuant to the laws of the Commonwealth of Pennsylvania.

7.      Terrance C. Shallenberger, Jr. ("Shallenberger"), an individual, purports to own 51% of the limited partnership interests of Debtor, REC, and 51% of the limited partnership interests of Debtor, Riverhounds Acquisition Group, L.P. ("RAG").

8.      Shallenberger is currently operating as the Debtor-in-Possession with respect to these proceedings.

9.      David M. Wilke ("Wilke") is an individual who was part of the original ownership group of REC, and a member of the original ownership group of the Debtor in the related RAG bankruptcy case filed at 14-21181-JAD (REC and RAG are at times herein collectively hereinafter referred to as the "Companies").

10.     On or around July 31, 2013, Wilke was the single-largest owner of REC, holding an ownership interest of 48.40%.

11.     Several other individuals and entities besides Wilke also held equity positions in REC at that time, with the other ownership percentages reflected as follows:

| Name of Former Limited Partner | Former Percentage of Ownership |
|---|---|
| Jason Kutney | 22.90% |
| Christine Astorino | 5.10% |
| Teresa Conn | 4.10% |
| Franco Harris | 1.10% |
| Craig Cozza | 17.90% |
| Riverhounds Event Center Management, LLC | 0.50% |

(Together with Wilke, these individuals and entities are collectively hereinafter referred to as "Former Owners of REC").

12.    During the summer of 2013, REC and RAG had incurred various debts, most of which stemmed from cost overruns related to the construction of Riverhounds' Highmark Stadium in 2012.

13.    In order to begin to repay these debts, Wilke, along with the other Former Owners of REC, sought investors who would purchase ownership interest(s) in REC in exchange for contributions of necessary funds to support the continued operations of REC and RAG.

14.    Shallenberger surfaced as an interested investor.

## A.    The Partnership Interest Agreement

15.    In exchange for a 51% ownership interest in REC and RAG ("the Partnership Interests"), Shallenberger agreed to alleviate the financial woes of the Companies in agreeing to obtain $4.6 million in new credit facilities and provide collateral as security for payment of the indebtedness created by the aforementioned new credit facilities.

16.    On August 5, 2013, Shallenberger caused to be drafted a Partnership Interest Agreement, which memorialized conditions under which the Partnership Interest was sold. (*See* Partnership Interest Agreement, dated August 5, 2013, at Para. 2, page 3, attached hereto as Exhibit A).

17.    Pursuant to the Partnership Interest Agreement, Shallenberger agreed to: (a) pay a nominal up-front payment of $1,080; (b) replace Craig Cozza as an individual guarantor on the REC Ground Lease Agreement with Station Square Gaming, L.P.; and (c) obtain $4.6 million in new credit facilities under which Shallenberger would provide collateral as security for payment

of the indebtedness created (the "New Credit Facility"), all in exchange for a 51% ownership

interest in the Companies. (*See id.* at Para. 2(b)-(c), 3.2).

18.    The New Credit Facility was intended to be used to pay off existing indebtedness

owed by the Companies, the majority of which is now secured and unsecured debt in the REC

and RAG bankruptcies.

19.    With respect to the New Credit Facility, the Partnership Interest Agreement states,

in relevant part:

> After the Closing and immediately upon approval from the First
> National Bank, other lenders of the Seller, and any other parties
> required to consent to additional, different or alternative financing
> for Seller, the Buyer, Terrance C. Shallenberger Jr. or an entity
> controlled by Terrance C. Shallenberger Jr. commits to
> immediately seek an additional **Four Million Six Hundred
> Thousand and 00/100 Dollars ($4.6 million)** in new credit
> facilities for the Seller (collectively "New Credit Facilities") **and
> as acceptable to the lender(s) of the New Credit Facilities
> provide collateral as security for payment of the indebtedness
> created by the New Credit Facilities to the extent necessary to
> obtain the New Credit Facilities** and in an amount and upon such
> terms and conditions as acceptable to Buyer, Terrance C.
> Shallenberger Jr. or an entity controlled by Terrance C.
> Shallenberger Jr.

(*See id.* at Para. 2(c)) (emphasis added).

20.    In exchange for Shallenberger's commitments to REC, the ownership interests of

the Former Owners of REC were to be diminished by approximately fifty-percent (50%) each,

with the post-closing ownership of REC as noted below:

| Name of Post-Closing Limited Partner | Post-Closing Proposed Percentage of Ownership |
|---|---|
| Shallenberger Investments, LLC | 51.0% |
| David Wilke | 26.05% |
| Jason Kutney | 10.10% |
| Christine Astorino | 0.10% |
| Teresa Conn | 2.04% |
| Franco Harris | 0.51% |
| Craig Cozza | 10.10% |
| Riverhounds Event Center Management LLC | 0.10% |

(*See id.* at Page 5, Para. 4.1).

21.     First National Bank and other lenders and parties of REC approved the issuance of the $4.6 million New Credit Facility.

22.     As anticipated by all parties to the Partnership Interest Agreement, including Shallenberger, and as part of the refinancing, at some point soon after August 5, 2013, First National Bank requested that Shallenberger provide the anticipated collateral as security for the New Credit Facility.

23.     Shallenberger refused to provide the requisite collateral to First National Bank as he was contractually obligated to do, and the New Credit Facility was not issued; and, to date, remains unissued.

24.     Notwithstanding the fact that Shallenberger defaulted on his contractual commitment to obtain the $4.6 million New Credit Facility in exchange for both of the Partnership Interests, Shallenberger began holding himself out as the 51% owner of the Companies in August of 2013, and continues to do so.

25.     As a direct result of Shallenberger's refusal to provide the collateral and security for the New Credit Facility, the Companies became unable to service their debt or pay their creditors.

**B.**    **The Law Firm of Watson, Mundorff, Brooks & Sepic, LLP Negotiates as Counsel for Shallenberger and then as General Counsel for REC and RAG.**

26.    Shallenberger's personal counsel, Charles Watson, Esquire, and Jarod Illar, Esquire, both of the law firm of Watson, Mundorff, Brooks & Sepic, LLP ("WMB&S") drafted the Partnership Interest Agreement.

27.    Mr. Wilke, who signed the Agreement on behalf of REC, was not represented by counsel at the time of entering into the Agreement.

28.    Mr. Wilke understood that WMB&S knew the parties' agreement and was preparing the document appropriately in light of that agreement.

29.    Approximately four months ago, and prior to these bankruptcy proceedings, on or around December 10, 2013, Movants' counsel sent a letter to WMB&S, demanding that Shallenberger fulfill his obligations under the Partnership Interest Agreement in order to satisfy the mounting debts of REC and RAG and to fend off a potential bankruptcy.

30.    WMB&S did not respond to the demand letter.

31.    Instead, further blurring the lines between the interests of Shallenberger and REC and RAG, WMB&S stated that it was "general counsel for both the team and the stadium," concluding that "representation of Mr. Shallenberger on this issue presents a conflict for us." (*See* Email correspondence from C. Watson to S. Lehman on Dec. 10, 2013, attached hereto as Exhibit B).

32.    Thus, it remains both unclear and befuddling how WMB&S could have drafted the Partnership Interest Agreement for Shallenberger, represented and advised Shallenberger thereto, recognized that REC and RAG had no counsel of their own during such transaction, and then, once the provisions of the Agreement were called into question, become counsel for REC and RAG.

33.    Underscoring the problematic interconnection between Shallenberger, the Companies, and WMB&S, is the fact that Shallenberger listed the debt for legal fees owed to WMB&S as "undisputed." (*See* Amended 20 Largest for REC, at Docket No. 103; *see* Second Amended 20 Largest for REC, at Doc. 118).[1]

### C.    Leech Tishman Appears as Counsel for REC and RAG, Albeit Under the Continued Control of Shallenberger.

34.    Mr. Illar of WMB&S, who played a key role in drafting and leading negotiations relative to the Partnership Interest Agreement, is married to Crystal Thornton-Illar, a partner in the Bankruptcy & Creditors Rights Practice Group at Leech Tishman. (*See* Amended Application to Employ David W. Lampl, John M. Steiner, Crystal H. Thornton-Illar, and Leech Tishman Fuscaldo & Lampl, LLC as Counsel for the Debtor Filed by Debtor Riverhounds Event Center, Docket No. 113, at Exhibit A, page 9, ¶ w).

35.    After having represented and advised Shallenberger with respect to the Partnership Interest Agreement, and after having been put on notice of Movants' demands relative thereto, WMB&S referred the representation of REC and RAG to Leech Tishman, who has only recently filed an Application to serve as counsel for REC and RAG. (*See id*.).

36.    Then, on or around January 7, 2014, Leech Tishman, specifically William Buck, Esquire, identified himself as counsel for REC relative to the dispute between REC and Shallenberger under the Partnership Interest Agreement.

37.    Mr. Buck directed Movants' counsel to immediately discontinue correspondence to WMB&S, and further advised Movants' counsel that Leech Tishman would be reviewing

---

[1]    Specifically, not only has REC and RAG failed to review the rights that the Companies may have relative to the WMB&S representation, but Shallenberger has gone so far as to list the amount owed to WMB&S as "undisputed." Again, this clearly highlights, at the very least, one of the many of Shallenberger's conflicts of interest.

matters relative to the Partnership Interest Agreement. (*See* Email correspondence from W. Buck to S. Lehman on Jan. 7, 2014, attached hereto as Exhibit C).

38.    On January 13, 2014, Movants' counsel met with Leech Tishman and others wherein Movants' counsel reiterated both the urgency of the matter and the written demand that REC pursue a claim against Shallenberger to satisfy his obligations under the Partnership Interest Agreement.

39.    From approximately January 7, 2014 through February 7, 2014, Movant, David M. Wilke, through undersigned counsel, made clear to Leech Tishman that Mr. Wilke, the single largest shareholder of REC (who was not to be a party to the New Credit Facility required pursuant to the Partnership Interest Agreement)[2] demanded that REC immediately force Shallenberger to finalize his required obligation under the Agreement in order to avoid bankruptcy.

40.    During the time period referenced in the preceding paragraph, Leech Tishman, on behalf of Shallenberger, engaged in settlement negotiations with Movants' counsel.

41.    After the filing of these bankruptcy proceedings, Leech Tishman informed Movants' counsel that REC elected not to demand or require Shallenberger to finalize his required obligation under the Partnership Interest Agreement.

42.    Axiomatically, an attorney provides advice and guidance to his/her client, while the client – in this instance, REC – makes determinations relative to its legal rights and obligations.

---

[2]    Wilke made this demand as the largest shareholder in REC.  To the extent that this fact is disputed, Wilke is, at a minimum, the second largest individual shareholder of REC, who, significantly, has no self-interest or conflict with respect to the issuances of the New Credit Facility under the Partnership Interest Agreement. (*See supra*, ¶¶ 10-11, 20).

43.    The fact remains that Leech Tishman, prior to appointment as counsel for Debtors

in these proceedings, either: (a) ignored the demand from Wilke to pursue REC (even though

Wilke is the single-largest disinterested shareholder of REC relative to the issue at hand); or (b)

was controlled in its decision to enforce Shallenberger's obligations under the Partnership

Interest Agreement by Shallenberger himself.[3]

44.    Further, and again blurring the interrelated web between Shallenberger and the

Companies, Leech Tishman admits that it represented REC and RAG with respect to certain

"Restructuring Matters" in and around January of 2014, the fees for which were paid (into and

immediately out of RAG) by Shallenberger prior to this bankruptcy action. (*See* Docket No. 113,

pages 6-7, ¶ 30).

**D.    Shallenberger Cannot Serve as Debtor-in-Possession as a Result of Misconduct,
Lack of Evenhandedness, Conflicts of Interest and an Inability to Pursue Himself in
an Estate Cause of Action.**

45.    Finally, based on the foregoing, it is believed and therefore averred that at points

between June of 2013 and March of 2014, Shallenberger consummated several substantial

personal transactions with affiliates, including WMB&S, Leech Tishman, Shallenberger

Investments, LLC, Shallenberger Sportsplex, Connellsville Soccer Club, Shallenberger

Construction, Inc., Shallenberger Trucking, LLC, Appalachian Water Services, LLC, Fayette

Coal & Coke, Inc., and Shallenberger Rentals, LLC, through REC and RAG and/or through the

use of REC and/or RAG funds.

46.    Despite having breached his contractual commitment to obtain the New Credit

Facility in the amount of $4.6 million for REC, Shallenberger has sought and now obtained

---

[3]    In either case, and as set forth more fully in Movants' Objection to the Appointment of Leech Tishman as
Counsel for Debtors, Leech Tishman has not been, and cannot be, independent from Shallenberger with respect to
managing the dealings, claims, and demands of and for the Debtors.  (*See* Docket No. 66).

permission from this Court to loan REC a sum of $100,026.00 as an allowed administrative expense having priority over all administrative expenses, secured by a perfected priority lien and security interest on all property of REC, subordinate only to the valid liens and perfected security interests. (*See* Proposed Order and Order for DIP Financing, at Docket Nos. 54-1, 55).

47.    Shallenberger has likewise sought permission from the Court to offer additional DIP financing to REC in excess of $400,000.00.

48.    Shallenberger is also alleged to have unsecured claims against REC in the total amount of $90,451.66 (*See* Amended 20 Largest, at Docket No. 103 and as revised at Docket No. 118).

49.    At other points in this case, Shallenberger has claimed to have unsecured claims against REC totaling $2,530,469.97.    (*See* Emergency Motion for Debtor-in-Possession Financing, at Docket No. 19, page 4, ¶ 20).

50.    As Authorized Agent of the General Partner of REC, Shallenberger identifies his own $90,451.66 unsecured claims as "undisputed" in the Amended List of Creditors Holding 20 Largest Unsecured Claims filed in this matter on April 8, 2014.

51.    As with Shallenberger's unsecured claims, the unsecured claim of WMB&S against REC for $14,973.50 is also listed as "undisputed." (*See* Amended 20 Largest, at Doc. 103 and as revised at Docket No. 118).

52.    Yet, Shallenberger lists two unsecured claims owed to Movants, Greentree Sportsplex, L.P., in the amount of $99,763.62, and Wilke & Associates, LLP in the amount of $63,523.73, as "disputed."

53.    The actual amount owed to Greentree Sportsplex, L.P. by REC is $169,763.62. (*See* Proof of Claim, Claims Register, Claim No. 5).

54.     Shallenberger neglects entirely to include three other unsecured claims owed by

REC to the following unsecured creditors, as follows:

| Unsecured Creditor | Amount |
|---|---|
| David M. Wilke | $65,571.52 |
| David M. Wilke | $250,000.00 |
| DW & BW, Inc. | $112,316.00 |

(*See id.* Claim Nos. 1, 2, and 4).

55.     Based on these facts as well as the legal predicates set forth below, Shallenberger

cannot remain Debtor-in-Possession in this action.

## ARGUMENT

A.     **Standard of Review**

56.     Section 1104(a)(1) of the United States Bankruptcy Code provides for the

appointment of a trustee in a Chapter 11 case, as follows:

> At any time after the commencement of the case but before
> confirmation of the plan, on request of a party in interest or the
> United States trustee, and after notice and a hearing, the court shall
> order the appointment of a trustee –
>
> (1)     for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement of the affairs of the debtor by current
> management, either before or after the commencement of the case
> or similar cause, but not including the number of holders of
> securities of the debtor or the amount of assets or liabilities of the
> debtor; or
>
> (2)     if such appointment is in the interests of creditors, any
> equity security holders, and other interests of the estate, without
> regard to the number of holders of securities of the debtor or the
> amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

57.     The two rationales justifying the appointment of a Chapter 11 trustee under 11

U.S.C. § 1104 are disjunctive and provide two separate bases for the appointment of a trustee,

either of which can be satisfied in a given case. *In re Anniston Food-Rite, Inc.*, 20 Bankr. 511-514-15 (Bankr. N.D. Ala. 1982).

58.     While there is a presumption in Chapter 11 cases that the debtor-in-possession should be permitted to remain in control of the debtor, if cause exists, it is nevertheless appropriate for the court to appoint a trustee in order to preserve the integrity of the bankruptcy process and to insure that the interests of all creditors are served. *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3rd Cir. 1998); *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

59.     For the reasons more fully set forth herein, there are two bases justifying the appointment of a Chapter 11 trustee in this case. First, "cause" exists as that term is defined under 11 U.S.C. § 1104(a). Second, the appointment of a trustee is in the best interest of the creditors and other interested parties under 11 U.S.C. § 1104(b).

**B.     Cause Exists for the Appointment of a Chapter 11 Trustee.**

60.     Subsection (a)(1) mandates the appointment of a trustee for cause, and provides a non-exhaustive list of conduct warranting such appointment. Additional factors affecting a court's decision to appoint a trustee include:

(a)     Materiality of the misconduct;

**(b)     Evenhandedness, or lack of same, in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;**

(c)     The existence of pre-petition voidable preferences or fraudulent transfers;

**(d)     Unwillingness or inability of management to pursue estate causes of action**

  **(e)  Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;** and

  (f)  Self-dealings by management or waste or squandering of corporate assets.

*Intercat*, 247 B.R. at 921 (emphasis added).

  61.  Where cause is shown, courts have no discretion but must appoint a trustee. *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644-45 (Bankr. E.D.N.Y. 1980); *In re McCordi Corp.*, 6 B.R. 172, 176-78 (Bankr. S.D.N.Y. 1980); *In re Eichorn*, 5 B.R. 755, 757 (Bankr.·D. Mass. 1980).

  62.  Further, a court may find cause to appoint a trustee on a case-by-case basis when the inherent conflicts between debtor and other parties extend beyond the "healthy conflicts" that always exist between debtor and creditor or when the parties "begin working at cross-purposes" *See In re Marvel*, 140 F.3d, at 473 (*quoting In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996)); *see also In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *see also* In re Bonded Mailings, Inc., 20 B.R. 781, 786 (Bankr. E.D.N.Y. 1982) (appointing trustee where a neutral third party was necessary to mediate the serious dispute between current management and major creditors).

  63.  Likewise, parties' inability to make considered decisions about the handling of the bankruptcy case due to longstanding acrimony between the debtor and creditors can rise to a level of "cause" under § 1104(a)(1), necessitating the appointment of a trustee. *See In re Marvel,* 140 F.3d at 472; *see In re: US Mineral Productions Co.*, 105 Fed.Appx. 428, 430-31 (3d Cir. 2004) (holding that a trustee may be appointed based on the "…contentious and acrimonious nature of the relationships among the parties, the lack of trust, the lack of progress, and the need for a neutral party to 'maximize value and construct a plan. . . acceptable to creditors' "); *see*

*also Tradex Corp. v. Morse*, 339 B.R. 823 (Bankr. D. Mass. 2006) (explaining that the court only needs to find cause by a preponderance of the evidence, as opposed to clear and convincing evidence).

64.    Here, at least three, and perhaps all six, examples of conduct warranting the appointment of a trustee under § 1104(a) are present.

65.    Shallenberger – and his affiliates – wear countless hats and are faced with a number of considerable and irreconcilable conflicts of interest.

66.    Not only has Shallenberger blatantly disregarded his contractual obligations of the Partnership Interest Agreement in refusing to secure the substantial New Credit Facility for REC, but he instructed his advisors not to pursue him for his obligation to REC, thus placing the Companies in a precarious financial position only then to have the Companies file for bankruptcy and then propose to be the DIP Lender for REC, and all the while contending that he and his related entities maintain "undisputed" secured and unsecured claims against both REC and RAG.

67.    Most notably, Shallenberger is both unwilling and unable to pursue a sizeable and impactful estate cause of action against himself for his substantial breach of his contractual commitment to REC to obtain the $4.6 million New Credit Facility.

68.    Shallenberger cannot make a non-biased decision relative to pursuing this estate cause of action because he is the target of that cause of action, which he has, to date, refused to pursue. This fact alone supports the appointment of a Chapter 11 trustee for cause.

69.    Further and very interestingly, Shallenberger has identified the debts owed to him and his affiliates as "undisputed," while contending that the incomplete list of debts prepared by him owed to Movants and others not associated with Shallenberger are "disputed."

70.    Contrary to representations by Leech Tishman that Shallenberger is the "white

knight" swooping in to rescue REC and save the Riverhounds' season, by virtue of his breach of

the Partnership Interest Agreement and refusal to obtain the New Credit Facility in August of

2013, Shallenberger is the very reason the Companies are now in bankruptcy.

71.    As the veritable "fox in the hen house," it is simply unrealistic to expect a

Shallenberger-controlled Debtor to undertake a meaningful investigation or make efforts to

recover substantial sums from what should have been paid by Shallenberger himself.

**C.    The Appointment of a Chapter 11 Trustee is in the Best Interests of the Creditors
and Other Interested Parties.**

72.    Section 1104(b) provides for the appointment of a trustee "if such appointment is

in the interests of creditors." 11 U.S.C. § 1104(b).

73.    In analyzing § 1104(b), courts look to the practical realities and necessities of the

given case. *Sharon Steel*, 871 F.2d at 458.

74.    Among the discrete factors considered, courts weigh the cost of appointment

against: (a) the trustworthiness of the debtor; (b) the past and present performance of the debtor-

in-possession and the prospects of rehabilitation; (c) the confidence – or lack thereof – of the

business community and the creditors in present management; and (d) the benefits derived by the

appointment of a trustee. *In re Ridgemour Meyer Properties, LLC*, 413 B.R. 101, 112 (Bankr.

S.D.N.Y. 2008) (internal citations omitted).

75.    The fact that a motion for the appointment of a Chapter 11 trustee is filed close to

the petition date should not deter a court from granting the relief sought. *See e.g., In re Patman

Drilling Int'l, Inc.*, No. 07–34622–SGJ, 2008 WL 724086, *6-7 (Bankr. N.D. Tex. Mar. 14,

2008) (granting motion filed three months after petition date where clear conflicts of interest and

mismanagement were present).

76.    In this case, Shallenberger's management and business decisions relative to REC over the past eight months have been, at best, questionable and untrustworthy.

77.    At worst, Shallenberger has improperly manipulated the finances of REC to the tune of $4.6 million and has further, and somewhat inexplicably, convinced Debtor that initiating a voluntary bankruptcy proceeding whereby Shallenberger has preference as secured creditor and DIP Lender is somehow preferable to enforcing Shallenberger's covenant to REC under the Partnership Interest Agreement.

78.    Based on the foregoing, Movants, who are collectively sizeable unsecured creditors in this action, cannot and do not trust Shallenberger's ability to oversee these proceedings as debtor-in-possession.

79.    For these reasons, Movants submit that the immediate appointment of a Chapter 11 trustee is both necessary and appropriate in this case.

## CONCLUSION

80.    Cause exists for the appointment of a Trustee in this matter, due to, *inter alia*, Shallenberger's gross mismanagement of the pre-petition affairs of REC and RAG, a lack of evenhandedness, a pattern of self-interested conduct on the part of management, and an unwillingness and inability to pursue estate causes of action.

81.    As a result of this misconduct and inexorable self-interest, the appointment of a trustee is also critical and in the best interests of REC and RAG and the creditors, as Mr. Shallenberger has no incentive to recover and preserve assets for the reorganization of REC and RAG and/or provide payment to creditors.

WHEREFORE, Movants, David M. Wilke, Greentree Sportsplex, LP, Wilke & Associates, LLP, and DW & BW, Inc., respectfully request that this Court enter an Order,

substantially in the form attached hereto, granting the within Motion for the Appointment of a

Trustee, and granting such other and further relief as may be just and proper.

April 16, 2014                                    Respectfully submitted,

                                                 SHERRARD, GERMAN & KELLY, P.C.

                                                 By:     _/s/ Beverly A. Block_____
                                                         Stanley J. Lehman, Esquire
                                                         P.A. ID 31455
                                                         Beverly A. Block, Esquire
                                                         P.A. ID 93406
                                                         Gary Philip Nelson, Esquire
                                                         P.A. ID 27603
                                                         28th Floor, Two PNC Plaza
                                                         Pittsburgh, PA 15222
                                                         412-355-0200