# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | |
| | Bankruptcy Case No. 14-21181-JAD |
| RIVERHOUNDS ACQUISITION GROUP, LP, | Chapter 11 |
| Debtor, | Document No. ___ |
| DAVID M. WILKE, GREENTREE SPORTSPLEX, LP; WILKE & ASSOCIATES, LLP; DW & BW, INC., | Related to Document No. 104 |
| | Hearing Date: April 24, 2014 |
| Movants, | Hearing Time: 10:00 AM |
| v. | Response Deadline: April 23, 2014 |
| RIVERHOUNDS ACQUISITION GROUP, LP, | |
| Respondent. | |
| IN RE: | Bankruptcy Case No. 14-21180-JAD |
| RIVERHOUNDS EVENT CENTER, LP, | Chapter 11 |
| Debtor, | Document No. ___ |
| DAVID M. WILKE, GREENTREE SPORTSPLEX, LP; WILKE & ASSOCIATES, LLP; DW & BW, INC., | Related to Document No. 122 |
| | Hearing Date: April 24, 2014 |
| Movants, | Hearing Time: 10:00 AM |
| v. | Response Deadline: April 23, 2014 |
| RIVERHOUNDS EVENT CENTER, LP, | |
| Respondent. | |

**OBJECTION OF SHALLENBERGER INVESTMENTS, LLC TO MOTIONS TO APPOINT CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)(1)-(2)**

AND NOW comes Shallenberger Investments, LLC ("Shallenberger Investments"), by and through its undersigned counsel, Babst, Calland, Clements and Zomnir, P.C. and files the within Objection to the Motions to Appoint Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)(1)-(2) (the "Motion") filed by David M. Wilke ("Mr. Wilke"), Greentree Sportsplex, LP ("Sportsplex"); Wilke & Associates, LLP ("Wilke & Associates") and DW & BW, Inc. ("DW & BW" and together with Mr. Wilke, Sportsplex and Wilke & Associates, the "Wilke Entities") in the above captioned related cases[1], averring as follows:

## INTRODUCTION

In March of 2013, Shallenberger Investments was asked to join the ownership group of the Pittsburgh Riverhounds professional soccer organization and since that time has invested a significant amount of time and money into the organization with the goal of providing the citizens of Western Pennsylvania with a championship-level soccer team and a first-class stadium facility. That goal has been needlessly and unnecessarily frustrated by the actions of the Wilke Entities. The filing of the instant Motions to Appoint a Chapter 11 Trustee is yet another example of the Wilke Entities' attempts to disrupt the reorganization and restructuring efforts of Riverhounds Acquisition Group, LP and Riverhounds Event Center, LP (collectively, the "Debtors"), which restructuring will only benefit the Debtors Estates, their creditors and the entire Western Pennsylvania community.

In addition to the complete lack of legal basis for the relief requested, the Motion is replete with factual inaccuracies, material omissions and completely mischaracterizes the investment of Shallenberger Investment's in the Debtors. First and foremost, the Wilke Entities

---

[1] The Wilke Entities have filed Motions to Appoint a Chapter 11 Trustee in the above captioned related cases (See Doc No. 104 of Case No. 14-21181-JAD (the "RAG Motion") and Doc. No. 122 of Case No. 14-21180-JAD (the "RAG Motion")(the RAG Motion and REC Motion may be referred to individually or collectively as the "Motion"). As the RAG Motion and REC Motion are virtually identical, Shallenberger Investments has filed an identical Objection to the Motions at both the RAG and REC cases.

{B1554729.2}                           2

allege that Terrance C. Shallenberger, Jr. ("Mr. Shallenberger") and/or Shallenberger Investments have "committed dishonest acts" and "gross mismanagement of the affairs of the Debtors." Yet, the Motion is completely devoid of any facts or alleged facts to support such careless and reckless statements, which statements have caused considerable harm to Mr. Shallenberger, Shallenberger Investments and the Debtors[2]. Additionally, in the Motion and throughout these proceedings thus far, the Wilke Entities allege that Shallenberger Investments "seized a 51% ownership interest in both the team and stadium in exchange for a single payment of $1,080.00." *See* Motion, ¶ 1. Nothing can be more inaccurate and further from the truth.

The Wilke Entities' Motion is nothing more than a disgruntled partner attempting to smear the reputation of Shallenberger Investments and Mr. Shallenberger to shift the blame for the Debtors' bankruptcy filing to Shallenberger Investments, when in fact it was the gross mismanagement of the Debtors by Mr. Wilke and the Wilke Entities prior to the involvement of Shallenberger Investments that caused the Debtors to seek Chapter 11 protection. In short, the Wilke Entities' Motion is nothing more than a last ditch effort by the Wilke Entities to extract something from Shallenberger Investments or Mr. Shallenberger, not sufficient cause to appoint a Chapter 11 trustee.

**PROCEDURAL HISTORY**

1.     On March 26, 2014 (the "Petition Date"), Riverhounds Acquisition Group, LP ("RAG") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq* (the "Bankruptcy Code") at case number 14-21181-JAD.

---

[2] Shallenberger Investments and Mr. Shallenberger hereby expressly reserve their rights pursuant to Federal Rule of Bankruptcy 9011 regarding the allegations contained in the Motion.

{B1554729.2}                                 3

2. Riverhounds Event Center, LP ("REC") also filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date as a related case at case number 14-21180-JAD.

3. RAG is a Pennsylvania limited partnership and the current owner and operator of the Pittsburgh Riverhounds professional soccer organization (the "Riverhounds").

4. REC is a Pennsylvania limited partnership and the current owner and operator of the stadium facility located at 510 West Station Square Drive, Pittsburgh, PA 15219 (the "Stadium"). The Stadium is used by and is the home of the Riverhounds.

5. Both RAG and REC continue to operate their businesses and manage their property as debtors-in-possession pursuant to 11 U.S.C. § 1107(a) and 1108.

6. On April 17, 2014, a Committee of Unsecured Creditors (the "Committee") was appointed in the REC case and the law firm of Campbell & Levine, LLC has filed a Notice of Appearance and Request for Notice on behalf of the Committee.

7. No Committee of Unsecured Creditors has been appointed in the RAG case.

## FACTUAL HISTORY

8. As the Wilke Entities' Motion is replete with factual inaccuracies and material omissions, it is important and necessary for Shallenberger Investments to provide the Court with an accurate summary of the facts and circumstances surrounding the investments made in the Debtors by Shallenberger Investments and the events leading up to the bankruptcy filings, since the Wilke Entities have elected not to do so.

**A.  The RAG Partnership Interest Purchase Agreement.**

9. On or about March 28, 2013, Shallenberger Investments purchased a seventy-five percent (75%) ownership interest in RAG pursuant to that certain Partnership Interest Purchase Agreement dated March 28, 2013 (the "RAG Partnership Interest Purchase Agreement") by and between RAG and Shallenberger Investments and that certain Assignment of Partnership Interest dated March 28, 2013 (the "RAG Assignment of Partnership Interest") and executed by David M. Wilke, as a member of Riverhounds Acquisition Group Management, LLC ("RAGM"), the general partner of RAG.  True and correct copies of the RAG Partnership Interest Purchase Agreement and the RAG Assignment of Partnership Interest are attached hereto as Exhibits "A" and "B", respectively.

10. Conveniently, the Wilke Entities do not disclose nor have they ever disclosed to the Court the existence of the RAG Partnership Interest Purchase Agreement in the Motion or in any other pleading which they have filed to date.

11. Pursuant to the RAG Partnership Interest Purchase Agreement dated March 28, 2013, Shallenberger Investments purchased 297 units of RAG, which is equivalent to a seventy-five[3] (75%) ownership interest, in exchange for Shallenberger Investments' cash payment of $1,999,400.00 to RAG.

12. The initial investment of $1,999,400.00 by Shallenberger Investments in RAG was necessary because the Debtors were unable to pay their debts under the direction of the Wilke Entities and without the infusion of additional capital, RAG would not have been able to continue operations and the Riverhounds would have been forced to end their 2013 season.

---

[3] Accordingly, the Wilke Entities' statement that "[o]n or around July 31, 2013, Sportsplex was the single-largest owner of RAG, holding an ownership interest of 36.73%" (RAG Motion, ¶ 10), is wholly inaccurate.  To the contrary, after Shallenberger Investment's purchase of 297 units in March of 2013 and until August 2013, Sportsplex only owned 36.73 units, which amounted to a less than 9% ownership interest in RAG.

{B1554729.2}                                5

13. In accordance with the terms of the RAG Partnership Interest Purchase Agreement, Shallenberger Investments paid the sum of $2,000,000 to purchase the 297 units of RAG in three (3) payments: (i) a payment of $500,000.00 in March 25, 2013; (ii) a payment of $1,000,000 on April 10, 2013 and (iii) a payment of $500,000.00 on May 1, 2013 (the "RAG Purchase Payments").

14. Ironically, the RAG Purchase Payments were made to RAG while Mr. Wilke and/or the Wilke Entities were in control of the books and records of RAG. There can be no explanation as to why the Wilke Entities have failed to disclose these transactions to the Court.

15. Additionally, under the direction of the Wilke Entities, the Debtors incurred significant construction overrun costs to build the Stadium, and in 2013 many contractors were threatening to file mechanics liens if their claims were not paid.

16. Although the RAG Purchase Payments were intended and necessary to fund delinquent construction claims, Mr. Wilke directed that Sportsplex be paid the sum of $66,000.00 and that Wilke & Associates be paid the sum of $159,605.00 directly from the RAG Purchase Payments.

17. Notwithstanding Shallenberger Investment's initial investment of almost $2,000.000.00 in early 2013, both REC and RAG were in need of additional significant contributions to continue operations.

B. **The REC Partnership Interest Purchase Agreement.**

18. Thereafter, on or about August 5, 2013[4], REC (as Seller), Shallenberger Investments (as Buyer), Terrance C. Shallenberger, Jr., David Wilke, Craig Cozza, Jason

---

[4] On August 5, 2013, RAG and Shallenberger Investments entered into that certain Reorganization Agreement whereby RAG and Shallenberger Investments agreed to reduce the 297 units held by Shallenberger Investments in RAG to 202.05 Units, with the intent of reducing Shallenberger Investment's ownership interest in RAG to 51%. A

{B1554729.2}                                  6

Kutney, and Wilke & Associates entered into that certain Partnership Interest Purchase Agreement dated August 5, 2013 (the "REC Partnership Interest Purchase Agreement"), whereby Shallenberger Investments purchased 510,000 units of REC, which equated to a 51% ownership interest in REC.

19.     In exchange for the 510,000 units of REC, Shallenberger Investments agreed to an upfront cash payment of $1,080.00 and also agreed to **_seek_** additional alternative financing for REC in the amount of $4.6 million (the "New Credit Facilities")(emphasis added).

20.     As provided for by the express terms of the REC Partnership Interest Purchase Agreement, Shallenberger Investments, Mr. Shallenberger or an entity controlled by Mr. Shallenberger agreed *to immediately seek* the New Credit Facilities in an amount an upon terms and conditions acceptable to Shallenberger Investments, Mr. Shallenberger or an entity controlled by Mr. Shallenberger.  (*See* REC Partnership Interest Purchase Agreement, Section 2(c))(emphasis added).

21.     Contrary to the Wilke Entities' allegations, Shallenberger Investments did immediately explore alternative financing from several lenders.  However, the terms and conditions of any such alternative financing options were onerous and unacceptable to Shallenberger Investments and Mr. Shallenberger because, among other things:   (i) the prospective lender requested that the financing be secured by collateral consisting of all of the assets in all entities that Mr. Shallenberger had an interest in, whether or not related to RAG or REC; and (ii) that Mr. Shallenberger sever all of his existing and long standing banking relationships and transfer all of the banking relationships for himself and all of his companies to the lender.

---

true and correct copy of the August 5, 2013 Reorganization Agreement executed between RAG and Shallenberger Investments is attached hereto as Exhibit "C".

{B1554729.2}                                                 7

22. Notwithstanding that Shallenberger Investments, Mr. Shallenberger, or an entity controlled by Mr. Shallenberger, did not have an absolute obligation to obtain $4.6 million in New Credit Facilities pursuant to the express terms of the REC Partnership Interest Purchase Agreement, Shallenberger Investments, Shallenberger Construction, Shallenberger Enterprises, Shallenberger Properties and Mr. Shallenberger (collectively, the "Shallenberger Entities") nonetheless have advanced approximately $5,429,645.12 (exclusive of the Reimbursed Items described in Paragraph 32), to the Debtors since March 25, 2013 in the form of cash to purchase interests in the Debtors, loans to the Debtors, and for construction services necessary to complete the Stadium. A detailed itemization of the monies advanced by the Shallenberger Entities, which itemization was provided to Shallenberger Investments by Gleason & Associates[5], is attached hereto and is incorporated herein as Exhibit "D."

23. In fact, the loans made by Shallenberger Investments to the Debtors were evidenced by Promissory Notes, many of which were executed by David M. Wilke in his capacity as a member of Riverhounds Event Center Management, LLC ("RECM") or RAGM. A true and correct example of one such Promissory Note dated August 5, 2013 in the amount of $500,000.00 is attached hereto and is incorporated herein as Exhibit "E."

24. As a result, it would be impossible and misleading for Mr. Wilke or the Wilke Entities to suggest that Shallenberger "seized" control of the Debtors for a mere $1,080.00. Yet, nowhere in the Wilke Motion or any pleadings filed by the Wilke Entities to date has the investment of $5.4 million by the Shallenberger Entities been disclosed to the Court.

---

[5] On April 23, 2014, the Debtors and/or Gleason & Associates provided copies of various financial documents to counsel for Shallenberger Investments, Counsel to the Committee of Unsecured Creditors and Counsel to the Wilke Entities, which financial documents included: (i) REC-RAG Payment Detail-Wilke Related—Exhibit F hereto; and (ii) Shallenberger Amounts in Riverhounds—Exhibit D hereto.

{B1554729.2}                                                  8

25. Notwithstanding the fact that Shallenberger Investments provided substantial cash and services to prop up the Debtors with the hope of saving the entities from Chapter 11 filings; the $5.4 million (and certainly not the $4.6 million in New Credit Facilities) was not enough to overcome the nearly $9 million in secured debt, a stadium lease with no option to purchase, and a business model created, designed and saddled with debt and expenses by the Wilke Entities for the two Debtors, neither of which have had an operating profit since their inception.

26. Ironically, in or around the same time period that in excess of $5.4 million dollars was being invested in the Debtors by the Shallenberger Entities, and all the while the Debtors were losing significant sums of money, the Wilke Entities helped themselves to payments of approximately $1,179,000.00 from the Debtors.

27. Further, since 2009, the Wilke Entities have been paid or received payments from the Debtors in excess of $4,323,650.00 for management fees, accounting services, loan repayments and other services notwithstanding that neither Debtor has ever operated at a profit. A detailed itemization of the monies paid to or taken by the Wilke Entities since 2009, which itemization was provided to Shallenberger Investments by Gleason & Associates, is attached hereto and is incorporated herein as Exhibit "F."

28. Important to note is the fact that prior to the Debtors' bankruptcies, Wilke & Associates purported to serve as the accountant for both REC and RAG. During the time period of April 2013 through the Petition Date, the Debtors paid Wilke & Associates at least $293,000.00 for accounting services.

29. Notwithstanding that Wilke & Associates was paid such an exorbitant sum for accounting services, Gleason & Associates has had to completely reconstruct and redraft the books and records of the Debtors since the filing of the bankruptcies and establish completely

new accounting practices because the books and records of the Debtors were in such disarray under the control and direction of the Wilke Entities.

30. Perhaps even more troubling than the accounting practices of the Debtors' under Wilke & Associates, is the fact that in October 2012, David Wilke personally paid himself approximately $318,528.00 from RAG, despite the fact that during that same time period RAG could not pay its debts as they became due.

31. Ironically, since Shallenberger Investments and Mr. Shallenberger's related entities began investing in the Debtors, loaning money to fund the operations or providing construction services to complete the Stadium, Mr. Shallenberger has only been reimbursed the sum of $80,629.25 (the "Reimbursed Items"), which amounts were paid by RAG to reimburse Mr. Shallenberger for amounts advanced by him to REC to bring Wigan Athletic F.C., an English soccer team, to the Stadium for an exhibition in 2013 ($40,000.00) and to reimburse Mr. Shallenberger for amounts he advanced for travel expenses so that the Riverhounds could travel to Houston, Texas for spring training in 2014 ($40,629.25), which amount was paid directly to Mr. Shallenberger's American Express account.

## ARGUMENT

### A. Standard of Review

32. Section 1104 of the Bankruptcy Code provides in relevant part as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest…and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause…; or

{B1554729.2}                                                10

> (2) if such appointment is in the interests of the creditors, any equity security holders, and other interests of the estate…

11 U.S.C. § 1104(a).

33. Decisions regarding the appointment of a Chapter 11 trustee must be made on a case-by-case basis; however, "it is settled that appointment of a trustee should be the exception rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989).

34. "The party moving for appointment of a trustee…must prove the need for a trustee under either subsection by clear and convincing evidence" and "this burden does not shrink or shift." *In re GI Holdings, Inc.*, 385 F.3d 313, 317-18, 320 (3d. Cir. 2004); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3d. Cir. 1998); *In re Sharon Steel*, 871 F.2d at 1226.

35. Appointing a trustee in a Chapter 11 case "is an 'extraordinary' remedy, and there is a corresponding 'strong presumption' that the debtor should be permitted to remain in possession." *The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003).

36. In the usual Chapter 11 case, the debtor remains in possession throughout the reorganization because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *Marvel*, 140 F.3d at 471 (citing *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524 (Bankr.E.D.N.Y. 1989)). Thus, the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: 'the debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.'" *Marvel*, 140 F.3d at 471 (citing *Petit v. New England Mort. Servs.*, 182 B.R. 64, 69 (D.Me. 1995)).

{B1554729.2}    11

37.	The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization. *See Sharon Steel*, 871 F.2d at 1226.

38.	Absent fraud or some other compelling reason, it is preferable to have the Chapter 11 debtor's current management operate the debtor's business, rather than to appoint a trustee. **"The preference for retention of current management is stronger where the debtor is a closely held entity whose reputation and good will is closely identified with its owners and/or management team."** *In re 4C Solutions, Inc.*, 289 B.R. 354, 370 (Bankr.C.D.Ill. 2003)(emphasis added).

### B. The Court Should Deny the Wilke Entities' Motion as There is No Factual or Legal Basis for Such Extraordinary Relief

39.	The entirety of the Wilke Entities' Motion is simply an endeavor by Mr. Wilke and the Wilke Entities to smear the name of Shallenberger Investments and Mr. Shallenberger to divert attention away from the pre-petition acts of the Wilke Entities and to mislead the Court, the creditors and the general public.

40.	More importantly, the Wilke Entities have not met their burden of proving that a trustee is needed by clear and convincing evidence because their Motion contains no factual support whatsoever and is nothing more than sweeping allegations of a disgruntled former majority interest holder of the Debtors.

41.	Moreover, since Shallenberger Investments has become involved with RAG and REC, it has expended considerable time and money to improve the reputation and continued viability of the Debtors with the community, the Debtors' creditors, vendors, the landlord, and

the USL PRO Division of the United Soccer League, through which the Riverhounds are franchised.

### (i) The REC Partnership Interest Agreement.

42. Paragraphs 15 through 25 of the Wilke Entities' Motion contain mischaracterizations of the express written terms of the REC Partnership Interest Purchase Agreement, which is attached to the Wilke Entities' Motion, and is a document which speaks for itself.

43. More specifically, the Wilke Entities' attempt to insinuate that Shallenberger Investments breached its contractual duties under the REC Partnership Interest Purchase Agreement, and as a result, the Debtors became unable to service their debt or pay their creditors. *See* Motion, ¶ 24 ("…Shallenberger defaults on his contractual commitment to obtain the $4.6 million New Credit Facility in exchange for both of the Partnership Interests"); Motion, ¶ 25 ("As a direct result of Shallenberger's refusal to provide the collateral and security for the New Credit Facility, the Companies became unable to service their debt or pay their creditors.").

44. Section 2(c) of the REC Partnership Interest Purchase Agreement provides as follows:

> After the Closing and immediately upon approval from First National Bank, other lenders of the Seller, and any other parties required to consent to additional, different or alternative financing for Seller, the Buyer, Terrance C. Shallenberger, Jr. or any entity controlled by Terrance C. Shallenberger, Jr. **commits to immediately seek** an additional **Four Million Six Hundred Thousand and 00/100 Dollars ($4,600,000.00)** in new credit facilities for the Seller (collectively, the "New Credit Facilities") and as acceptable to the lender(s) of the New Credit Facilities provide collateral as security for payment of the indebtedness created by the New Credit Facilities to the extent necessary to obtain the New Credit Facilities **in an amount and upon such terms and conditions as acceptable to Buyer, Terrance C.**

**Shallenberger, Jr. or any entity controlled by Terrance C. Shallenberger, Jr.**

(REC Partnership Interest Purchase Agreement, Section 2(c))(emphasis added).

45. Nowhere in the REC Partnership Interest Purchase Agreement, does it provide that Shallenberger Investments, Mr. Shallenberger or an entity controlled by Mr. Shallenberger *shall obtain* the New Credit Facilities. Section 2(c) merely states that Shallenberger Investments, Mr. Shallenberger or an entity controlled by Mr. Shallenberger will *commit to immediately seek* New Credit Facilities.

46. Noticeably absent from the Wilke Entities' Motion is the fact that Shallenberger Investments did immediately contact various lenders in the Pittsburgh region in attempts to secure additional financing for the Debtors; however, Shallenberger Investments was unable to obtain such financing on terms and conditions reasonably acceptable to Shallenberger Investments or Mr. Shallenberger.

47. Moreover, the fact that the Shallenberger entities have invested over $5.4 million in the Debtors since March of 2013 completely negates any equitable argument that the Shallenberger Investments breached the spirit of the REC Partnership Interest Purchase Agreement by failing to obtain the New Credit Facilities.

48. Additionally, the Wilke Entities mischaracterize how the Debtors intended to use the New Credit Facilities, in the event that such New Credit Facilities were ultimately obtained.

49. The New Credit Facilities, if obtained, were to be used to pay off construction related debt incurred from the construction of the Stadium in the approximate amount of $2 million which would have left approximately $2.6 million to fund ongoing operations of the Debtors, which is considerably less than the $5.4 million actually advanced by the Shallenberger Entities and used to fund operations.

50. Notwithstanding the fact that Shallenberger Investments had no absolute obligation to obtain $4.6 million pursuant to the express terms of the REC Partnership Interest Purchase Agreement, Shallenberger Investments has advanced over $5.4 million into the Debtors to pay off construction contractors owed significant sums of money for construction of the Stadium, but also to fund the ongoing operations of the Debtors, including the payment of basic utilities and rent.

51. Assuming arguendo that the allegations in Paragraphs 15 through 25 have some merit, which Shallenberger Investments expressly denies, the allegations by the Wilke Entities amount to nothing more than the existence of a partnership dispute, not grounds for the appointment of a Chapter 11 Trustee. Moreover, to the extent that the Wilke Entities believe that Shallenberger Investments breached the REC Partnership Interest Purchase Agreement, then the Wilke Entities and/or the Debtors' estates have the right to pursue such a cause of action against Shallenberger Investments or Mr. Shallenberger; however, the filing of motion to appoint a Chapter 11 Trustee is not the appropriate avenue for venting such concerns.

**(ii) The Law Firm of Watson, Mundorff, Brooks & Sepic, LLP Negotiates as Counsel for Shallenberger and then as General Counsel for REC and RAG; Leech Tishman Appears as Counsel for REC and RAG, Albeit Under the Continued Control of Shallenberger.**

52. It is completely unclear exactly how the allegations contained in Paragraphs 26 through 44 of the Wilke Entities' Motion are even relevant to whether or not a Chapter 11 trustee should be appointed for the Debtors.

53. To the extent that the Wilke Entities intend to imply that there is an inherent conflict of interest that prejudices the Debtors' estates by the fact that the law firms of Watson, Mundorff, Brooks & Sepic, LLP ("Watson Mundorff") and Leech, Tishman, Fuscaldo & Lampl, LLC ("Leech Tishman") were involved in representing the Debtors and/or Shallenberger

Investments or Mr. Shallenberger in the past, significant measures have been taken by the Debtors and Shallenberger Investments to avoid any alleged or actual conflict, including full disclosure to this Court of any potential or alleged conflict since the Petition Date.

54. In particular, prior to and thus far throughout these bankruptcies the Debtors have been represented by Leech Tishman, and currently pending before this Court is an Application to Employ David W. Lampl, John M. Steiner, Crystal Thornton-Illar, and Leech, Tishman Fuscaldo & Lampl, LLC (RAG Docket No. 96; REC Docket No. 113). The Application to Employ Leech Tishman includes an Amended Affidavit by John M. Steiner which expressly declares that Leech Tishman is "disinterested" as defined in Section 101(14) of the Bankruptcy Code, and that neither Leech Tishman nor its attorneys represent or hold an interest adverse to the Debtors' estates. Moreover, the Application to Employ provides that Leech Tishman does not represent Shallenberger Investments or Mr. Shallenberger.

55. Additionally, REC has filed an Application to Employ the Stonecipher Law Firm as Special Conflicts Counsel (REC Docket No. 114), to the extent that Leech Tishman's representation of both RAG and REC may pose a potential conflict of interest. In its Motion, Leech Tishman has not identified any facts or circumstances that would create an actual conflict of interest. Nonetheless, REC proposes to engage the Stonecipher Law Firm and Ronald B. Roteman to act as Special Conflicts Counsel, to ensure that the Debtors' estates and all creditors are treated fairly and equitably. To be clear, Shallenberger Investments has no objections whatsoever to the retention of the Stonecipher Firm as Special Conflicts Counsel.

56. Shallenberger Investments has also retained independent counsel, Babst Calland, which has been representing Shallenberger Investments prior to and throughout the Debtors' bankruptcies.

57. Additionally, in the REC case, a Committee of Unsecured Creditors has been appointed by the Office of the United States Trustee, and Campbell & Levine, LLC has been identified as Committee counsel. The Wilke Entities have not alleged that Campbell & Levine will not provide independent and competent advice to the Committee.

58. In the event that any creditor believes that a cause of action or causes of action exists that should be brought against Shallenberger Investments, the Wilke Entities or any other party, the Debtors, through its counsel has the first opportunity to bring such an action(s). Second, if the Debtor does not bring such an action(s), Special Conflicts Counsel may bring such an action(s). Lastly, in the event that Debtors' Counsel nor Special Conflicts Counsel asserts such a cause of action(s), Counsel to the Committee of Unsecured Creditors may seek leave to file such actions. Accordingly, there are multiple levels of protection in place to address any potential issues regarding conflicts of interest and to prevent any prejudice to the Debtors' estates and their creditors.

59. The Wilke Entities' Motion repeatedly states that the Debtors have refused to pursue actions against Shallenberger Investments and that "Shallenberger has instructed his advisors not to pursue him for his obligation…" *See e.g.* Motion, ¶¶ 39, 41, 64, 65, 66.

60. At no time has Shallenberger Investments or Mr. Shallenberger instructed the Debtors or Leech Tishman not to pursue any potential cause of action against Shallenberger Investments, Mr. Shallenberger or any entity controlled by Mr. Shallenberger and strict proof to the contrary is hereby demanded by Shallenberger Investments.

61. It is ironic that the Wilke Entitles are quick to point out unfounded and alleged conflicts of interest between the Debtors and Shallenberger Investments, all which have separate counsel representing them in these bankruptcies; yet, all of the Wilke Entities, which includes

David M. Wilke, personally and three separate entities which he controls, are represented by one counsel, Sherrard, German & Kelly, P.C. To the extent that any of the Wilke Entities received transfers from the Debtors at the direction of Mr. Wilke, which transfers may be avoided under Chapter 5 of the Bankruptcy Code or applicable non-Bankruptcy law, a conflict amongst the Wilke Entities and its counsel will almost assuredly arise.

> **(iii) Shallenberger Cannot Serve as Debtor-in-Possession as a Result of Misconduct, Lack of Evenhandedness, Conflicts of Interest and an Inability to Pursue Himself in an Estate Cause of Action.**

62. The allegations contained in Paragraph 45 of the Wilke Entities' Motion are borderline unintelligible and it is unclear how such allegations can be construed to constitute the appointment of a Chapter 11 trustee.

63. Additionally, the Wilke Entities make several references that "Shallenberger cannot serve as debtor-in-possession" (Motion, ¶ D) and that Movants do not trust "Shallenberger's ability to oversee these proceedings as debtor-in-possession" (Motion, ¶ 76), implying that Shallenberger Investments and/or Mr. Shallenberger is the debtor-in-possession. Any such statements or allegations that Shallenberger Investments is the debtor-in-possession are clearly inaccurate and evidence the Wilke Entities' complete lack of familiarity with basic bankruptcy law as only RAG and REG can be considered debtors-in-possession under the Bankruptcy Code.

**C. Cause Does Not Exist to Support the Appointment of a Chapter 11 Trustee nor is Such Appointment in the Best Interest of the Creditors.**

64. As evidenced by the foregoing arguments, "cause" does not exist under § 1104(a) of the Bankruptcy Code for the appointment of a Chapter 11 Trustee and the Wilke Entities' Motion is nothing more than an attempt by a disgruntled partner to (i) smear the reputation of

Shallenberger Investments and Mr. Shallenberger, and (ii) raise alleged conflicts of interest between the Debtors and Shallenberger Investments.

65. Despite the Wilke Entities' best efforts, which efforts include setting forth factual inaccuracies, material omissions and mischaracterizations to the Court, such alleged conflicts of interest do not rise to the level of "cause" under § 1104(a)(1) and the Wilke Entities' have not met their burden of proof that a Chapter 11 Trustee should be appointed by clear and convincing evidence.

66. As explained in detail throughout this Objection, the Debtors have put multiple levels of protection in place to address any potential issues regarding conflicts of interest and to prevent any injustice or prejudice to the Debtors' estate and their creditors.

67. Additionally, a Chapter 11 Trustee is not in the best interests of the creditors of the Debtors' estates or other parties in interest as provided for in § 1104(a)(2) of the Bankruptcy Code, as the appointment of a Chapter 11 Trustee may jeopardize the debtor-in-possession financing and could potentially force the Debtors to cease operations all together or convert to a liquidation under Chapter 7. Assuredly, a complete shutdown of the Debtors would not serve to benefit the creditors, parties-in-interest, the season ticket holders of the Riverhounds or the participants of the various soccer academies and camps scheduled for this season.

68. The Wilke Entities' baseless allegations that Shallenberger Investment's involvement with the Debtors has been questionable and untrustworthy are nothing more than that—baseless allegations. To the contrary and as explicitly detailed in this Objection, since Shallenberger Investments initially invested in the Debtors, it has done nothing but put forth considerable time and money to improve the reputation and continued viability of the Debtors

with the Western Pennsylvania community, the Debtors' creditors, vendors, the landlord and the United Soccer League.

## CONCLUSION

69. For the foregoing reasons and because the Wilke Entities did not prove by clear and convincing evidence that grounds exist for the appointment of a Chapter 11 Trustee under §§ 1104(a)(1) or 1104(a)(2), the Wilke Entities' Motion for the Appointment of Chapter 11 Trustee should be denied.

WHEREFORE, Shallenberger Investments, LLC respectfully requests that the Court immediately deny the Wilke Entities' Motion.

Respectfully submitted,

Dated: April 23, 2014

BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.

BY: /s/ Erica L. Koehl
David W. Ross, Esquire
PA I.D. No. 62202
dross@babstcalland.com
Erica L. Koehl, Esquire
PA I.D. No. 306829
ekoehl@babstcalland.com
Babst, Calland, Clements & Zomnir, P.C.
Firm No. 812
Two Gateway Center, 7th Floor
Pittsburgh, PA 15222
(412) 394-5400

*Counsel to Shallenberger Investments, LLC*